UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

HOLLY HORRIGAN,

                Plaintiff,

      -against-


PENDLETON TRADING SYSTEMS, INC., et al.,

              Defendants.

-------------------------------------------------------------x

05 cv 00959 (RJH)

**<u>MEMORANDUM
OPINION AND ORDER</u>**

**FILED UNDER SEAL**


     Plaintiff Holly Horrigan brings the current action against her former business partner, John Wald, and the New Jersey corporation of which he is president and sole shareholder, Pendelton Trading Systems, Inc. (Amended Compl. ¶¶ 2-3.) Asserting diversity jurisdiction under 28 U.S.C. § 1332, she alleges breach of contract, as well as breach of the covenant of good faith and fair dealing, with respect to a stock redemption agreement and accompanying stock pledge agreement entered into with defendants. Defendants have moved to dismiss the complaint for lack of personal jurisdiction and for failure to state a claim upon which relief can be granted under Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiff has cross-moved to transfer it to the District of New Jersey in the event this Court finds no jurisdiction.

**BACKGROUND**

Unless otherwise noted, the following facts are taken from the Amended Complaint in this action.  In January 2001, plaintiff and defendants entered into a Stock Redemption Agreement ("SRA"), in which she transferred her 51% interest in Pendleton back to the corporation in exchange for $10.00 and "promises regarding future royalty payments, certain covenants, promises and oversight [privileges]."  (Amended Compl. ¶ 6.)  According to the SRA, Pendleton "is engaged in the business of developing a technology known as 'Optimal Limit Order Choice,'" apparently a method designed to aid investor decisionmaking.  (Statement of Purpose, SRA, Amended Compl. Ex. A; Compl. (ITG action) ¶ 9 *passim*.)  At the time the SRA was entered, the technology was "the subject of a United States Patent Application based on Provisional Application Serial No. 60/100,381 (the "Technology").  (*Id.*)  Currently, Pendleton maintains a registered patent for this technology.  (Amended Compl. ¶ 2.)  Also in January 2001, plaintiff and defendant Wald entered into a Stock Pledge Agreement, "by which [Wald] pledged all of his shares of common stock in Pendleton to Horrigan as security for Defendants' performance of their obligations under the Stock Redemption Agreement."  (Amended Compl. ¶ 7.)

In March 2004, defendants brought an action in this district against Investment Technology Group (the "ITG action," filed under docket number 04cv01691(KMW)) for patent infringement and unfair competition.  The parties entered into a settlement agreement ("Settlement Agreement") with regard to that action in November 2005.  (*Id.* ¶¶ 9-10.)  Under the terms of the agreement, ITG paid $600,000 to Pendleton for an "irrevocable, permanent, fully paid-up worldwide, non-exclusive license" to the technology.  (Settlement Agreement at

2.) ITG also agreed to pay $500,000 in legal fees directly to Pendleton's counsel. (*Id.*)
Plaintiff now alleges that Section 4.2 of the SRA has been breached in several ways in
connection with defendants' pursuit and settlement of the ITG action.

First, plaintiff alleges that the entry into the settlement agreement is an act that
breaches the defendants' obligation under the SRA to "use all reasonable efforts to prosecute
the patent for the Technology and to exploit the Technology." Plaintiff (mistakenly) claims
that the settlement agreement provided for the assignment of "perpetual, unlimited patent
rights and/or interests to ITG and/or ITG's customers." (Amended Compl. ¶ 14.) This
assignment, she claims, "is not reasonable and does not reflect a reasonable effort to exploit
the technology and the Company's business" as it "irreparably hinders Pendleton's future
opportunities to prosecute the patent and exploit the technology and the Company's business."
(*Id.*) Apart from the ITG action, she further alleges that the "reasonable efforts" requirement
has been generally breached by the Company "failing to actively engage in business." (*Id.* ¶
17.)

Second, she alleges that defendant Pendleton has breached Section 4.2's provision that
"[t]he Company will advise [plaintiff] in writing no less frequently than quarterly of its
progress in prosecuting the patent and exploiting the Technology and will allow [plaintiff] to
comment on possible methods for business development." (Amended Compl. Ex. A.) The
Complaint alleges failure to make these notifications, both generally and with respect to their
progress in the ITG action. (Amended Compl. ¶ 19.)

Third, plaintiff alleges a breach of Section 4.2's requirement that defendants "will not
sell or assign the Technology or any interest therein other than the grant of non-exclusive
licenses in the ordinary course of business, without the consent of [plaintiff], which consent

will not be unreasonably withheld." (*Id.*)  According to plaintiff, the ITG license was not made in "the ordinary course of business" and defendants were required to, but did not obtain plaintiff's consent.

In addition to breaches of Section 4.2, the complaint alleges that Pendleton has failed to repay $11,700 in loans made to the company, as required under Section and Exhibit 5.3.[1] Of greater economic significance, plaintiff alleges that under Section 1.2 she is entitled to "royalties" equal to 25% of the company's "Gross Revenues" and that the gross revenues include the $500,000 in counsel fees paid by ITG to Pendleton's counsel as well as the $600,000 paid directly to Pendleton.  (Amended Compl. ¶¶ 27-34.)  Breaches of the accompanying stock pledge agreement (*id.* ¶¶ 35-40), and of the implied covenant of good faith and fair dealing under North Carolina law (*id.*, ¶¶ 46-50), are alleged as well.


## DISCUSSION

Where "a federal court's subject matter jurisdiction is based on diversity of citizenship, the court applies the law of the forum state to determine whether it has personal jurisdiction over a defendant." *Aldinger v. Segler*, 2005 WL 2591958, at *2 (S.D.N.Y. Oct. 13, 2005).  When responding to a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant by a prima facie showing based on its own affidavits and supporting materials.  *See Whitaker v. American Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001) (internal citations omitted); *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999); *Aldinger*, 2005 WL 2591958, at *2.  "A plaintiff must establish the court's jurisdiction with

---

[1] As part of his affidavit, Wald appends a copy of a check for $11,700, "which [he] sent to plaintiff concurrent with the filing of this motion," as repayment of these loans.  (Wald Aff., Ex. D)

respect to *each* claim asserted." *Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17, 24 (2d

Cir. 2004).

      While both defendants are located out-of-state, plaintiff argues that personal

jurisdiction may be found nevertheless under New York's C.P.L.R. 301(a)(1) (McKinney

2005), which provides that "[a]s to a cause of action arising from any of the acts enumerated

in this section, a court may exercise personal jurisdiction over any non-domiciliary ... [who]

transacts any business within the state or contracts anywhere to supply goods or services in

the state."  Under that statute, "long-arm jurisdiction over a nondomiciliary exists where (i) a

defendant transacted business within the state and (ii) the cause of action arose from that

transaction of business.  If either prong of the statute is not met, jurisdiction cannot be

conferred under CPLR 302(a)(1)." *Gulf Ins. Co. v. Caldor Corp.*, 2006 WL 1586571, at *5

(S.D.N.Y. June 9, 2006).  The Second Circuit has observed that:

> 302(a)(1) extends the jurisdiction of New York state courts to any nonresident who
> has purposely availed himself of the privilege of conducting activities within New
> York and thereby invoked the benefits and protections of its laws.  A single
> transaction would be sufficient to fulfill this requirement, so long as the relevant cause
> of action also arises from that transaction.  To determine whether a party has
> "transacted business" in New York, courts must look at the totality of circumstances
> concerning the party's interactions with, and activities within, the state.

*Bank Brussels Lambert*, 171 F.3d at 787 (internal citations and quotations omitted); *Pfizer*

*Inc. v. Gilman*, 2002 WL 215653, at *4 (S.D.N.Y. Feb. 13, 2002).

      New York law holds "that so long as the defendant's contacts with New York have

been purposeful and designed to permit it to conduct activities within New York," Section

302(a)(1) will apply even in circumstances where "defendant was never physically present in

New York." *Mayes v. Leipziger*, 674 F.2d 178, 184 (2d Cir. 1982) (noting that while isolated

contacts, such as phone calls into the state, will ordinarily not suffice standing alone,

purposeful projection of one's self into a New York business transaction will); *Parke-Bernet Galleries, Inc. v. Franklyn*, 26 N.Y.2d 13 (1970) (jurisdiction proper over California defendant who participated in New York art auction by telephone link to auctioneer's agent who then relayed defendant's bids).

Here, the parties more or less agree that the 2001 SRA—the contract at issue between the parties—has no relationship in and of itself to New York; though defendant Wald retained New York counsel, the SRA is governed by North Carolina law, and was negotiated and executed out-of-state by the parties.  (Affidavit of John Wald ("Wald Aff.") ¶¶ 9-17.) Plaintiff's jurisdictional argument, then, is that defendants' participation in the litigation and settlement of the ITA action in New York are forum-linked acts directly in violation of the SRA.

Plaintiff argues that defendants initiated the suit against ITG in the Southern District of New York, consulted with New York attorneys, and participated in activities in New York in connection with that suit.  In his affidavit, Wald describes visits to his New York attorneys in connection with the litigation, although "infrequent," and notes that he was deposed in New York and participated in two mediation sessions in this state.  (Wald Aff. ¶¶ 19-28.) Furthermore, the settlement agreement was entered into with a New York corporation, is governed by New York law, and the parties agreed to waive any jurisdictional objections to the court in that action's retention of jurisdiction for the purposes of enforcing the terms of the settlement.  (Wald Aff., Ex. B ¶¶ 2, 11.)

At least one court, in examining the jurisdictional effect of a defendant's filing of a proof of claim in a separate New York bankruptcy proceeding, has described it as "a stretch to characterize [such] activities in the Bankruptcy Court as 'transacting business' in New York.

The transaction of business normally is viewed as trading or commercial activity such as buying or selling, making contracts, or altering legal relationships between parties by committing a commercial tort or entering a commercial transaction." *Gulf Ins. Co..*, 2006 WL1586571, at *5-6. Here, however, defendants did indeed enter into a contract under New York law—the settlement agreement with ITG; furthermore, they pursued the initiation of that litigation in a New York forum, the Southern District, and defendant Wald visited New York in connection with the ITG action on a number of occasions.

When viewed in their totality, such intentional New York-directed activities are purposeful and continuous enough to make a prima facie showing of the "transacting business" element for personal jurisdiction under Section 302(a)(1). *See Shaw, Licitra, Bohner, Esernio, Schwartz & Pfluger, P.C. v. Lefkowitz*, 2002 WL 1969237 (N.Y.Dist.Ct. Aug. 15, 2002) (finding long-arm jurisdiction over a client in legal fee action because client chose to retain the attorney to prosecute her claims, met with him in New York for their initial consultation, and all of the legal services rendered involved matters pending in New York state courts); *Otterbourg, Steindler, Houston & Rosen, P.C. v. Shreve City Apartments Ltd.*, 147 A.D.2d 327, 332, 543 N.Y.S.2d 978, 981 (N.Y.App.Div. 1 Dept. 1989) (noting that "it has been held that the retainer by a non-domiciliary defendant of attorneys for the purpose of legal representation in this state is a purposeful transaction of business within the state sufficient to confer jurisdiction pursuant to CPLR 302(a)(1)" and holding in legal fee action that where defendants made many telephone calls into the state, participated in settlement negotiations relating to the pending legal proceedings by telephone conference calls, and entered into settlement agreement governed by New York law with payments to a New York entity, purposeful activity had occurred for jurisdictional purposes); *Kazlow and Kazlow v. A.*

*Goodman & Co., Inc.*, 92 Misc.2d 1084, 1086, 402 N.Y.S.2d 98, 99 (N.Y.Sup. 1977) ("What constitutes a 'transaction of business' has been defined as '. . . some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protection of its laws.' The affirmative and deliberate use of the courts of this state by defendant through its attorneys render it amenable to our long-arm jurisdiction.") (internal citations omitted); *Overmyer v. Eliot Realty*, 83 Misc.2d 694, 700, 371 N.Y.S.2d 246, 253 (N.Y.Sup.Ct. 1975) ("[I]t is clear that defendant engaged in purposeful activity in this state by seeking enforcement of the Texas judgment and the Court holds such activity to be transaction of business here, which supports acquisition of *[i]n personam* jurisdiction."); 19 *Corpus Juris Secundum Corporations* § 943 (2006) ("Various activities have been held to constitute the transaction of business, such as the deliberate use of the state's courts by the foreign corporation"); 15 *N.Y. Jur. 2d Business Relationships* § 1134 ("Use of New York courts by a foreign corporation, taken together with frequent communications with its New York attorneys, amount to the transaction of business in the state for jurisdictional purposes.").

Moreover, regarding the second prong of the Section 302(a)(1) analysis, which requires that the cause of action arise from that same transaction of business, plaintiff's causes of action under the SRA are very closely bound to the ITG action and its settlement; indeed, defendants' conduct of the litigation, including settlement of the action, and payment to plaintiff of royalties out of the settlement proceeds are precisely the breaches that give rise to this complaint. "A claim arises out of a defendant's transaction of business in New York when there exists a substantial nexus between the business transacted and the cause of action sued upon." *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 31 (2d Cir.

1996) (internal quotation marks omitted); *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 61 (2d Cir. 1985) ("[I]n order to find the appropriate nexus, there must be a "direct relation between the cause of action and the in-state conduct."); *Beatie & Osborn LLP v. Patriot Scientific Corp.*, --- F.Supp.2d ----, 2006 WL 1233937, at *11 (S.D.N.Y. May 9, 2006) (jurisdiction may not be founded on upon "random, fortuitous or attenuated" contacts); *Ross v. UKI Ltd.*, 2004 WL 384885, at *4 (S.D.N.Y. Mar. 1, 2004) (on second prong of Section 302(a)(1) inquiry, the court must find "some articuable nexus between the business transacted and the cause of action sued upon … In a breach of contract case, the pivotal inquiry is whether the defendant has performed purposeful acts in New York in relation to the contract.") (internal citations and quotations omitted).   Having established that defendants transacted business in New York, "plaintiffs need show only that the cause of action is sufficiently related to the business transacted that it would not be unfair to deem it to arise out of the transacted business, and to subject the defendants to suit in New York." *Pfizer Inc. v. Gilman*, 2002 WL 215653, at *5 (S.D.N.Y. Feb. 13, 2002).  This, plaintiff has done.  But for the ITG action and its settlement, plaintiff would not have brought her instant causes of action.

Having resolved the jurisdictional question, the Court now turns to the legal sufficiency of the complaint.  In ruling on a motion to dismiss under Rule 12(b)(6), a court is required to read a complaint generously, accepting all the alleged facts as true and drawing all reasonable inferences in favor of the plaintiff.  *See LaBounty v. Adler*, 933 F.2d 121, 123 (2d Cir. 1991); *Frasier v. Gen. Elec. Co.*, 930 F.2d 1004, 1007 (2d Cir. 1991).  A court must deny the motion unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *See Conley v. Gibson*, 355 U.S. 41, 45-46

(1957). Additionally, "the review of such a motion is limited, and '[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir.1996) (citations omitted).

In determining the adequacy of the complaint, a court "may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint …[Courts] are not obliged to accept the allegations of the complaint as to how to construe such documents, but at this procedural stage, [they] should resolve any contractual ambiguities in favor of the plaintiff." *Subaru Distribs. Corp. v. Subaru of America, Inc.*, 425 F.3d 119, 122 (2d Cir. 2005).

By its terms, the SRA is governed by North Carolina law. "To state a claim for breach of contract, the complaint must allege that a valid contract existed between the parties, that defendant breached the terms thereof, the facts constituting the breach, and that damages resulted from such breach." *Claggett v. Wake Forest University*, 486 S.E.2d 443, 446 (N.C.Ct.App. 1997). Whether a defendant's "conduct as alleged constitutes a breach of the agreement is a jury question" under North Carolina law. *Dastgheib v. Genentech, Inc.*, 2006 WL 120052, at *4 (E.D. Pa. Jan 13, 2006) (*citing Lake Mary Ltd. P'ship v. Johnston*, 551 S.E.2d 546, 555 (N.C. Ct. App. 2001)); *Nakell v. Liner Yankelevitz Sunshine & Regenstreif, LLP*, 394 F.Supp.2d 762, 769-70 (2005) (M.D.N.C. 2005) ("[T]he Court notes that whether or not a breach occurred and, if so, whether it was material, would require a consideration of facts and evidence beyond the pleadings themselves … [W]hether a failure to perform a contractual obligation is so material as to discharge the other parties' performance is a question for the jury or for the trial court without a jury.") (internal citation omitted).

While it remains to be seen whether plaintiff can prove any of her claims, she has properly pled facts that, construed favorably to the plaintiff, may entitle her to relief. For example, plaintiff alleges that the terms of the settlement of the ITG action were unfavorable and resulted in a breach of defendants' obligation to use all reasonable efforts to exploit the Company's business. Whether or not this is so cannot be determined on a motion to dismiss. Plaintiff also alleges that her consent to the terms of settlement was necessary, as the granting of a license in the context of a patent litigation is not "in the ordinary course of business." Defendants seek to resolve this issue solely by reference to the introductory paragraphs of the SRA "in tandem with all other provisions describing Pendelton's obligations." (Defs.' Reply Mem. 6.) Plaintiff, however, should be given the opportunity to develop facts to support her claim that the settlement/license agreement was an extraordinary corporate event that required her consent. Plaintiff also adequately alleges a claim that Pendelton's "Gross Revenues" includes the $500,000 in legal fees paid directly by ITG to Pendelton's counsel pursuant to the terms of the settlement agreement and, therefore, that she is entitled under Section 1.2 of the SRA to 25% of this amount. Resolution of this claim cannot be made on the pleadings but requires the development of a factual record as to the nature of Pendelton's arrangements with its counsel.

However, because plaintiff does not allege that her good faith and fair dealing claim is based upon any facts other than those supporting her breach of contract claim, that claim "is dismissed as duplicative of [her] breach of contract claim." *B. Lewis Prods., Inc. v. Maya Angelou, Hallmark Cards, Inc.*, 2005 WL 1138474, at *11 (S.D.N.Y. May 12, 2005) (yet concluding that "the weight of North Carolina authority holds also that a claim for breach of the covenant of good faith and fair dealing based on facts identical to those supporting a

breach of contract claim should not be pursued separately"); *Mech. Indus. v. O'Brien/Atkins Assocs., P.A.*, No. 97 Cv. 99, 1998 U.S. Dist. LEXIS 5389, at *11 (M.D.N.C. Feb. 4, 1998) (noting that breach of good faith and fair dealing will only exist where there is a "special relationships between parties, e.g., cases involving contracts for funeral services and insurance" and where complaint has allegations of "bad faith, dishonesty, treachery, or commercial unreasonableness").

For the foregoing reasons, defendants' motion to dismiss the complaint for lack of personal jurisdiction is denied, and their motion to dismiss for failure to state a claim is denied in part and granted in part.  The parties are directed to appear for a status conference in Courtroom 17B, 500 Pearl Street, New York, NY on August 22, 2006 at 10:30 am.


Dated: New York, New York
       August 2, 2006

                                        Richard J. Holwell
                                        United States District Judge